JUDGE KATHLEEN CARDONE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

FILED

2016 APR 20 PM 5:56

U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ________ DEPUTY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>DAMON MURPHY (1),<br>[redacted]<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **SEALED INDICTMENT**<br><br>**CRIMINAL NO. EP-16-CR-__________**<br><br>**CT 1:** 18 USC §371-Conspiracy to Defraud the United States;<br>**CT 2:** 18 USC §§ 1349 & 1341-Conspiracy to Commit Mail Fraud;<br>**CT 3:** 18 USC §§ 1341 & 2-Mail Fraud, and Aiding and Abetting Mail Fraud;<br>**CT 4:** 18 U.S.C. §§ 1513(e) & 371 – Conspiracy to Retaliate against a witness;<br>**CT 5:** 18 U.S.C. § 1623 –False Declaration Before a Grand Jury;<br>**CT 6:** 18 U.S.C. § 1001 –False Statements |

**THE GRAND JURY CHARGES:**

EP16CR0693

**COUNT ONE**
**(18 U.S.C. § 371)**
**(Conspiracy to Defraud the United States)**

At all times relevant to this Indictment:

**INTRODUCTION**

1. Defendant **DAMON MURPHY** was an employee-administrator of the El Paso Independent School District (EPISD). During most of the period, he served as an EPISD Associate Superintendent.

2. Defendant [redacted] was an employee-administrator of EPISD. During most of the period, he served as an EPISD Assistant Superintendent-Secondary Schools Division.

3. Defendant [redacted] was an employee of the EPISD. During most of the period, he served as the Principal of Austin High School.

4. Defendant [redacted] was an employee of the EPISD. During most of the period, he served as an Assistant Principal of Austin High School.

5. **ESEA, Title I, NCLB**: Title I, Part A of the federal Elementary and Secondary Education Act of 1965 (ESEA), also known as the "**No Child Left Behind Act (NCLB)**," was enacted in 2001 to help ensure that all children have an equal opportunity to obtain a high-quality education and reach proficiency on academic achievement standards.

6. **Title I Funds/AYP**: Title I, NCLB provides federal financial assistance to public schools with disadvantaged children (children from low-income families) by measuring each school and school district's progress toward meeting mandated goals based on **Adequate Yearly Progress (AYP)**.

   AYP goals include four indicators: reading/language arts and math test performance, attendance and graduation rates. When a school district misses AYP, the state is required to take at least one of several specified corrective actions against the district, including, but not limited to, requiring the institution of new curriculum, replacing the relevant personnel or removing specific campus(es) from the district's jurisdiction.

7. **TAKS**: From 2007 through 2011, every eligible tenth grade Texas public high school student was required to be assessed, for the purposes of evaluating Texas high schools for federal accountability, NCLB, using the Texas Assessment of Knowledge and Skills (TAKS) test, which included assessments for progress in reading; writing, social studies, mathematics, and science.

8. **"Subgroups"** or "federally required student groups" are groups of children classified by special needs, including: Limited English Proficiency (LEP); Special Education (SPED); Economically Disadvantaged; Hispanic and African-American, among others. NCLB established the number of students that constitute a subgroup. The subgroups are set at fifty (50) students or more for each school.

9. **Accountability for Subgroups**: The data collected and reported to the U.S. Department of Education (DOE) and the Texas Education Agency (TEA) for NCLB accountability purposes is required to be accurate. Data for a subgroup is required to be reported if there are 50 or more students in the subgroup. If a subgroup at a campus falls below fifty students, the campus is no longer measured for the performance of that subgroup for "accountability" purposes; those students are absorbed into the campus population as a whole and there is a greater chance that the campus will meet AYP.

10. **LEP**- Limited English Proficiency (subgroup). EPISD received federal Title I funds based upon the understanding that every student, including those classified as members of the LEP subgroup, would take the designated test for accountability, specifically, the tenth grade TAKS test.

    If a Spanish speaking student was new to EPISD, for up to three years, if necessary, they could take the TAKS test in Spanish, the Linguistically Accommodated Test (LAT). The scores of the LAT did not count to measure NCLB accountability, but the student's status as LEP was included in the numbers comprising the subgroup.

11. **SPED**: NCLB denominates Special Education (SPED) as a disadvantaged subgroup.

12. **Priority Schools Division** (PSD) -The EPISD Superintendent created the PSD at the end of the 2005-2006 school year to address academic needs at fifteen EPISD campuses which were either academically unacceptable or did not meet AYP for two consecutive years, and at an additional seven campuses which were labeled borderline by NCLB "accountability" standards and needed serious intervention. Five of EPISD's high schools were designated as Priority Schools.

13. **Campus Directors-** In order to monitor the progress of the campuses in the PSD, the EPISD Superintendent created the position of Associate Superintendent to oversee the PSD. Additionally, he created six positions entitled "Campus Director" and designated six individuals to work as Campus Directors with supervisory roles at Priority School campuses.

14. **The United States Department of Education** (DOE) is a federal regulatory agency of the Executive Branch of the federal government whose mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access. Among other activities, the DOE enforces federal laws prohibiting discrimination in programs that receive federal funding, including NCLB.

15. **PEIMS**: the Public Education Information and Management System (PEIMS) is a State of Texas computer tracking system which contains all the student demographic data for each district in the State, including data indicating whether a student is coded as being part of a subgroup, such as LEP or SPED.

16. **PEIMS Snapshot**: TEA mandates that a "snapshot" of the district's PEIMS data be taken the last Friday in October of each year and sent to TEA. The purpose of the snapshot submission is so the State of Texas can identify which students will be taking the TAKS in the Spring; which students taking the TAKS for accountability test in the tenth grade are members of subgroups; and other relevant data which is later passed on to a national company located outside of the state of Texas which prepares the tests for each student based on the student's demographic description.

17. **TEKS**: TEA mandates Texas Essential Knowledge and Skills (TEKS) which are basic academic requirements for student mastery of each course taken to obtain a credit necessary for graduation.

18. **Graduation Cohort**: One Element of NCLB AYP is a campus' graduation rate. Graduation rate is based on the percentage of freshmen who graduate in four years. A group of students who enter a high school as freshmen and graduate as seniors after four years is also known as the "cohort."

19. **Credit for Attendance:** Section 25.092 of the Texas Education Code requires, in part, that a student not be given credit for a course unless he or she was in attendance at least 90% of the days the course was offered. To award a student credit for a course attended for less than 90% of the time, a petition from the student must be heard and granted by a

formal Attendance Committee who may give credit to the student based on guidelines defining "extenuating circumstances" established by the district's Board of Trustees. A student who is attendance for at least 75 percent but less than 90 percent of the days a class is offered may be given credit or a final grade for the class if the student completes a plan approved by the school's principal that provides for the student to meet the instructional requirements of the class.

20. **Credit for Foreign Transfer Students**: Texas Administrative Code, Section 74.26(a)(2) requires that a school district must ensure that records of out-of-country transfer students are evaluated and that the student is placed in appropriate classes "promptly."

21. **Credit for Graduation:** Texas Administrative Code, Section 74.26(c) mandates that a student may only earn a credit for a course for high school graduation if the student receives a grade which is the equivalent of 70 on a scale of 100, based upon the "essential knowledge and skills for each course."

22. **Removal from the LEP subgroup**: Texas Administrative Code (TAC) mandated specific criteria that must be met in order to remove a student from the LEP classification subgroup:

    **89 TAC, Section 1225 (h):** For exit from a bilingual education or English as a second language program, a student may be classified as English proficient at the end of the school year in which a student would be able to participate equally in a general education, all-English, instructional program.

    **89 TAC, Section 1240:** The district shall notify the student's parent of the reclassification as English proficient and his or her exit from the bilingual education or English as a second language program as required under Texas Education Code , Section 29.056(a) The parent of a student enrolled in a district which is required to offer bilingual education or English as a second language programs may appeal to the commissioner of education if the district fails to comply with the law or the rules.

23. **EPISD Official Bilingual Education Policy**, Adopted February 8, 2000 and in place through June 6, 2013, regarding Bilingual Education, PROGRAM EXIT, tracked the language of Sections 1225 (h)and 1240 of the TAC.

24. **Rewards for Meeting AYP**: ESEA Section 1116(d)(2) provides that, should a local education agency meet or exceed the State's definition of adequate yearly progress as defined in 1111(b)(2)(A)(ii), the State may make institutional and individual rewards, including bonuses and recognition as described elsewhere in 1117(c).

The Grand Jury alleges and incorporates the Scheme and Artifice to Defraud alleged in Count Two as if fully set out herein.

Beginning on or about February 1, 2006 and continuing to and including on or about September 30, 2013, in the Western District of Texas, the District of Columbia and elsewhere,

the defendants,

DAMON MURPHY (1),



conspired and agreed together, with other employees of the El Paso Independent School District (EPISD) known, but not charged herein, and with others unknown to defraud the United States and an agency of the United States, that is, the defendants, by deception, conspired to impair, obstruct and defeat the legitimate function of the United States Department of Education, and

**Overt Acts**

in furtherance of the conspiracy, and to effect the objects thereof, at least one of the conspirators herein committed one or more of the following overt acts, among others, in the Western District of Texas, and elsewhere:

1. On or about September 2, 2008, at a Campus Improvement Leadership Team meeting, defendant, **DAMON MURPHY,** discussed the LEP rosters of students at the PSD high schools and gave a directive to adjust the rosters by reclassifying LEP students out of the tenth grade.

2. On or about 2008 through and including on or about 2010, at meetings of EPISD Principals, defendant, **DAMON MURPHY,** and others repeatedly gave high school principals "marching orders" to "put up barriers" to prevent students in the LEP subgroup from going onto the tenth grade.

3. In or about July 2008, defendant, **DAMON MURPHY,** implemented an EPISD strategy of withholding credits obtained by students who had transferred to EPISD from Mexico until the students had completed the 9th grade at EPISD, at which time the students would be placed in the 11th grade.

4. On or about December 12, 2007, defendant, **DAMON MURPHY,** issued a memo to EPISD High School Principals and Leaders regarding Reclassification of Sophomores in which he wrote, among other things, "Please note the attached regulation regarding mid-year reclassification of 10th graders." "Please note this reclassification process aids us in honoring students regarding their recent academic efforts. Furthermore, it brings them one step closer to graduating in a timely fashion with their peers."

5. On or about August 20, 2008, defendant, **DAMON MURPHY,** sent an email message to defendant, [redacted], and others stating, among other things, "When speaking with parents, please do not tell them that if their students pass fall semester

classes, they can petition to move to 10th grade at Christmas. That is against policy – they will remain 9th graders through May, 2009 regardless of credit performance during this school year...."

6. On or about August 12, 2008, the defendant, **DAMON MURPHY**, sent an email message directing Campus Directors and others to classify all foreign transfer students in the ninth grade for their entire first year at EPISD, irrespective of the foreign credits to which they were entitled.

7. In or about March 2009, defendant, **DAMON MURPHY**, issued a directive that students identified as having poor math skills would be pulled out of their enrolled classes to attend TAKS math tutoring.

8. On or about September 22, 2009, defendant, **DAMON MURPHY**, issued a "high priority" memorandum to High School Directors, Testing Coordinators, and ELL Leaders concerning an opportunity to exit students from LEP status to a status that did not "count against you," which also read, in part: "if you in any way are predicting a remote possibility of being under the 50/ 10%, getting as many students ASAP to 11 F 11 status is crucial."

9. On or about September 23, 2009, defendant [redacted], sent an email to the EPISD Campus Directors, listing the number of tenth grade students that were, on that date, classified as LEP in each EPISD high school.

10. During a 2009-2010 school year Principal's meeting held at Butterfield Trail, the defendant [redacted] emphasized that October 29, was the "snapshot" date for subgroups and provided instruction concerning the use of "leaver codes" that would not affect AYP accountability.

11. In or about the Spring of 2011, defendant, [redacted] instructed an administrator at El Paso High School not to reflect in the school's records the fact that credits that were awarded to students who had not been enrolled in the class for which the credit was awarded, had been earned through the "credit recovery" methods.

12. On or about Saturday, October 24, 2009, six days prior to the PEIMS snapshot date, a Campus Director, at the direction of defendant, **DAMON MURPHY**, reduced the Bowie High School LEP subgroup size by causing the official school transcripts of approximately 77 students to reflect they did not have the appropriate number of credits to be classified as sophomores.

13. Throughout the 2009-2010 school year, defendant, [redacted] directed an Austin High School administrator to change previously properly marked absences of students to make it appear as if the student were present on days designated by the State to measure the attendance rate.

14. On or about a date unknown, in the 2009-2010 school year, defendant, [redacted] told an Austin High School administrator to "make the attendance happen, no matter what it takes," and to "target the second and sixth period."



15. On or about a dates unknown, in the 2009-2010 school year, defendant, assisted defendant, in his efforts to change student attendance records by interviewing students who had been marked absent by their teacher.

16. On or about September 20, 2009, defendant, **DAMON MURPHY**, sent an email to defendant, entitled, "EPISD High School Credit Recovery Options," to which was attached a "Credit Recovery Matrix" which, among other things, permitted a student who was denied credit for a course based on the fact that he or she had not met the 90 percent State attendance requirement could "be handled solely by the principal" if the student had attended the class at least 75 percent of the time, regardless of the fact that no "extenuating circumstances" were present that caused the students' absences.

17. On or about January 4, 2011, defendant, sent an email entitled "Reminder of Mini-mester Plans," to a Campus Director, reminding the Director that the Credit Recovery Matrix, a copy of which was attached to the email, was "approved for the district."

18. On or about February 23, 2011, TAKS tests, prepared using high school student demographic information provided by EPISD to a test publishing company, were sent, via Federal Express, from Iowa City, Iowa to EPISD in El Paso, Texas.

19. On or about April 26, 2011, TAKS tests, prepared using high school student demographic information provided by EPISD to a test publishing company, were sent, via Federal Express, from Iowa City, Iowa to EPISD in El Paso, Texas.

20. On or about July 25, 2011, defendant, approved 182 credit recovery forms, restoring credit which had been denied Austin High School students based on the State mandated rules governing excessive absences, which forms provided no basis for the removal of the "no credit ("NC") code.

21. On or about July 28, 2011, defendant, approved 454 credit recovery forms, restoring credit which had been denied Austin High School students based on the State mandated rules governing excessive absences, which forms provided no basis for the removal of the "no credit ("NC") code.

22. On or about June of 2012, defendant caused the removal of 418 "no credit" ("NC") codes from the records of students at Austin High School to restore credits that counted for graduation of those students.

23. In or about the 2009-2010 school year, the defendant, caused approximately 11,000 fraudulent entries regarding absences of Austin High School, including 2756 changes to the records of 247 students in the 2009-2010 graduating cohort of 289 students.

24. In or about the Fall of 2010 and the Spring of 2011, defendant [REDACTED] instructed an Austin High School employee to withdraw students from the school without the students' parents' consent or notification, in violation of EPISD policy, and when the employee refused to do so without a written directive, the defendant, [REDACTED] ordered the employee to "just drop them."

all in violation of Title 18, United States Code, Sections 371.

**COUNT TWO**
**(18 U.S.C. §§ 1349 & 1341)**
**(Conspiracy to Commit Mail Fraud)**

The Grand Jury re-alleges and incorporates the Introduction and Overt Acts alleged in Count One of this Indictment as if fully set out herein.

Beginning on or about February 1, 2006 and continuing to and including on or about September 30, 2013, in the Western District of Texas, the District of Columbia and elsewhere, the defendants,

**DAMON MURPHY (1),**

[REDACTED]

conspired and agreed together with other employees of the El Paso Independent School District (EPISD) known, but not charged herein, and with others unknown 1.) to knowingly attempt to devise and devise a scheme and artifice to defraud the United States Department of Education, the TEA and the EPISD and 2.) to knowingly attempt to devise and devise a scheme and artifice to knowingly obtain money and property by means of material false and fraudulent pretenses, representations and promises both by affirmative acts and by deceitful concealment of material facts, both in violation of Title 18, United States Code, Section 1341; that is, the defendants conspired with each other and with others to violate the No Child Left Behind Act (NCLB) portion of the federal Elementary and Secondary Education Act (ESEA) in order to make the EPISD campuses in the Priority School Division (PSD) appear to meet NCLB accountability

status by artificially inflating the EPISD state and federal accountability scores by providing materially false, fictitious and fraudulent information to the TEA and the DOE regarding the grade classification, academic performance, and demographic make-up of students in order to mislead the United States government and the TEA concerning the manner in which the educational needs of the students were being met by EPISD; and in order to succeed in the conspiracy, the defendants, **DAMON MURPHY,** [redacted] and others encouraged EPISD employees to lie about such conduct and intimidated and threatened EPISD employees who did not follow the defendants' direction regarding the improper administration of education and NCLB criteria;

**SCHEME AND ARTIFICE TO DEFRAUD**

For the purpose of furthering the objects of the conspiracy, it was part of the scheme and artifice to defraud that the defendants used the following means for the purpose of executing the scheme and artifice to defraud:

1. Beginning in about July 2006 and continuing through June 2013, the defendants, as administrators and employees for the EPISD, created and implemented a strategy to meet NCLB accountability to reduce at-risk student population subgroups in the EPISD to below fifty students each so that the performance of the subgroups' students would not be measured for Adequate Yearly Progress (AYP) as part of the NCLB accountability standards.

2. Between July 2006 continuing through June 2013, the defendants, as administrators and employees for the EPISD, put policies and practices in place that prevented all applicable and eligible students from taking the tenth grade TAKS test, and practices which artificially inflated the graduation rates of campuses through the improper awarding or restoration of subject credits. These variables to AYP were intentionally manipulated for the purpose of evading federal accountability and misrepresenting the true level of academic performance of EPISD campuses.

3. An EPISD administrator created the Priority School Division (PSD), to identify, scrutinize, and control EPISD school campuses of all grade classifications which had failed to make Adequate Yearly Progress (AYP) by NCLB and TEA standards, and which were in the process of failing AYP or would likely fail AYP.

4. An EPISD administrator created the position of Associate Superintendent of PSD, and Assistant Superintendent of Secondary Education, which oversaw PSD and who would insure every measure was taken to "make sure the campus would get out of AYP jail."

5. Defendant **DAMON MURPHY** was appointed to supervise the PSD.

6. When defendant **DAMON MURPHY** left the EPISD, defendant [redacted] was appointed to supervise the PSD.

7. An EPISD administrator created the positions of "Campus Director" which were supervised by the Associate or Assistant Superintendent of the PSD. Each Campus Director was assigned to several PSD campuses. Although the EPISD administration stated that a Campus Director was to facilitate and assist the campus administration, in truth, regardless of the education, certification, or experience of the Campus Director, the Campus Director had more authority than the school Principal and had the power to set individual campus policy and to discipline and fire faculty if they did not comply with the conspirators' methods of securing AYP.

8. The defendants and others engaged in a systemic scheme to artificially inflate performance in EPISD secondary schools, particularly in Priority Schools, and thereby provided federal and state education agencies with false information that affected federal and state accountability measures.

8. The defendants devised methods to reduce the total tenth grade LEP student demographic by changing the number of credits required for LEP students to be classified as tenth graders;

9. The defendants devised a method to reduce the number of students taking the tenth grade TAKS test by creating a policy to withhold legitimately earned foreign credits from students transferring to EPISD from Mexico for a period of time that ensured the students did not enter the tenth grade in a timely manner, in contravention to State law.

10. The defendants devised a method to reduce the number of students taking the tenth grade TAKS test by improperly reclassifying students from the tenth grade to the ninth or eleventh grade, by changing passing grades to failing and failing grades to passing and by deleting students' credits from their transcripts.

11. The defendants devised a method whereby students who were removed from classes for TAKS tutoring were awarded false passing grades for the class from which they were pulled, thus the students received credits for the classes they rarely attended assuring they would graduate with their cohort.

12. The defendants devised and caused to be administered sham credit recovery methods, thus giving students credit for courses required for graduation which the students did not earn, in contravention of TEA TEKS and without ensuring mastery of the subject or demonstrating mastery of the subject.

13. In order to disguise the fact that certain schools were failing aspects of AYP, including graduation rate, the defendants encouraged and permitted the administration of credit recovery methods, such as "mini-mesters," to provide students with original credit for courses they had not taken, instead of limiting credit recovery methods to students who had taken, but failed the course, in contravention of State policy and the spirit of "recovery."

14. The defendants devised methods, including forgery of documents, to forgive excessive student absences in contravention of State standards, resulting in students achieving passing grades and course credit for participating in class less than the TEA mandated 90% attendance rate.

15. At each EPISD Campus Directors' Meeting, conspirators required each Campus Director to

identify students at their respective campuses who could be removed from the LEP subgroup by reclassification out of the tenth grade; those who could be placed in bogus credit recovery programs and/or TAKS tutoring pull out initiatives to regain or stay in their cohort for graduation; or other means to maintain a LEP demographic of fewer than 50 students at the campus to avoid AYP accountability or to artificially promote students to graduate.

16. Each Campus Director was responsible for carrying out the directives of EPISD administrators and of defendants **DAMON MURPHY** and [redacted], respectively, as the Associate Superintendent of the PSD and the Assistant Superintendent of Secondary Education, to reduce tenth grade LEP numbers to 49 students or less and to meet AYP by using and abusing any and all methods available to raise graduation rates;

17. To reduce the tenth grade LEP population to 49 or less students in the PSD high schools, defendants, unnamed co-conspirators and others devised methods to artificially eliminate students from appearing in the annual PEIMS snapshot as a tenth grade member of the LEP subgroup; which efforts would make it appear to the DOE and the TEA that the tenth grade did not have a LEP subgroup for the purposes of AYP and NCLB accountability;

18. To reduce the tenth grade LEP population to 49 or less students in the PSD high schools, defendants and unnamed co-conspirators, though intimidation and discouragement, caused students to withdraw from school or fail to enroll in school by conducting unwarranted residency checks and through threats and coercion.

19. Defendants and other co-conspirators, including defendant, [redacted] created a plan to reduce or eliminate the African-American subgroup at certain schools to make it appear to the DOE that no African-American subgroup existed on any EPISD PSD campus.

20. In order to assure meeting accountability standards, defendant, **DAMON MURPHY**, instructed a Campus Director to administer the TAKS M (Modified) test to students who were not designated as Special Education students to assure passing scores.

In furtherance of the scheme to defraud the United States and to obtain money and property by material false and fraudulent pretenses, representations and promises both by affirmative acts and by deceitful concealment of material facts, defendants **DAMON MURPHY,** [redacted] and uncharged co-defendants, on February 23, 2011, April 26, 2011, and on other dates within five years of the date of this indictment, sent and caused to be sent and delivered by commercial interstate carrier, Federal Express, testing materials from Iowa City, Iowa to El Paso, Texas, which testing materials contained false and fraudulent information regarding the true grade level of LEP students enrolled at the EPISD, and transmitted and caused the transmission by wire, in interstate

and foreign commerce, of writings, signs, signals, pictures and sounds, including EPISD campus ratings from the TEA in Austin, Texas to the DOE in Washington, D.C., all in violation of Title 18, United States Code, Sections 1349 and 1341.

**COUNT THREE**
**(18 U.S.C. §§ 1341 & 2)**
**(Mail Fraud and Aiding and Abetting Mail Fraud)**

The Grand Jury re-alleges and incorporates the Introduction and Overt Acts alleged in Count One, and the Scheme and Artifice to Defraud alleged in Count Two of this Indictment as if fully set out herein.

Beginning on or about February 1, 2006 and continuing to and including September 30, 2013, in the Western District of Texas, the District of Columbia and elsewhere, the defendants,

**DAMON MURPHY (1),**

as principals and aiding and abetting each other, did knowingly attempt to devise and devise a scheme and artifice to defraud the United States Department of Education, the TEA and the EPISD and did knowingly attempt to devise and devise a scheme and artifice to knowingly obtain money and property by means of material false and fraudulent pretenses, representations and promises both by affirmative acts and by deceitful concealment of material facts; that is, the defendants provided and caused to be provided materially false, fictitious and fraudulent information to the TEA and the DOE regarding the grade classification, academic performance, and demographic make-up of EPISD students in order to mislead the DOE and the TEA concerning the manner in which the educational needs of the students were being met at EPISD in order to make the EPISD campuses in the Priority School Division (PSD) appear to meet NCLB accountability status by artificially inflating the EPISD state and federal accountability

scores and the defendants, **DAMON MURPHY,** ███ and others encouraged EPISD employees to lie about such conduct and intimidated and threatened EPISD employees who did not follow the defendants' direction regarding the improper administration of education and NCLB criteria, and for the purpose of executing and attempting to execute the scheme and artifice to defraud and the scheme and artifice to obtain money and property by means of material false and fraudulent pretenses, representations and promises, both by affirmative acts and by deceitful concealment of material facts, on February 23, 2011, April 26, 2011 and on other dates within five years of the date of this indictment, sent and caused to be sent and delivered by commercial interstate carrier, Federal Express, testing materials from Iowa City, Iowa to El Paso, Texas, which testing materials contained false and fraudulent information regarding the true grade level of LEP students enrolled at the EPISD, all in violation of Title 18, United States Code, Sections 1341and 2.

**COUNT FOUR**
**(18 USC §§ 1513(e) & 371)**
**(Conspiracy to Retaliate Against a Witness)**

The Grand Jury re-alleges and incorporates the Introduction and Overt Acts alleged in Count One, and the Scheme and Artifice to Defraud alleged in Count Two of this Indictment as if fully set out herein.

Beginning on or about the Spring semester of the 2010-2011 EPISD school year and continuing to and including September of 2013, in the Western District of Texas and elsewhere, the defendants,



conspired with each other and with others known and unknown to the grand jury to retaliate and to take harmful action against a person for providing truthful information to a law enforcement officer relating to the commission of a Federal offense in violation of Title 18, United States Code, Section 1513(e); that is, the defendants, in retaliation for the fact that certain employees, of the EPISD, Teacher A and Teacher B, had provided and were providing truthful information to agents of the Federal Bureau of Investigation, federal law enforcement officers, concerning the commission of certain federal crimes, the defendants conspired to terminate and prevent the employment of Teacher A and Teacher B at Austin High School and to harm their personal and professional reputations, by trickery, deceit and lies, and

**Overt Acts**

in furtherance of the conspiracy, and to effect the objects thereof, at least one of the conspirators herein committed one or more of the following overt acts, among others, in the Western District of Texas, and elsewhere:

1. In or about the Spring semester of 2012, Austin High School Counselors collected approximately 156 pre-registration forms from 8th grade, middle school students for the 2012-2013 "AS" Class.

2. On or about August 28, 2012, Teacher A and Teacher B provided information to the FBI concerning conduct occurring at Austin High School related to a FBI federal criminal investigation.

3. On or about January 2013, the defendant [redacted] instructed employees of Austin High School to "fudge" student attendance numbers in certain Austin High School courses to make it appear to the EPISD Needs Assessment Committee that Austin had zero projected student enrollment in the classes to be taught by Teacher A and Teacher B.

4. On or about January 2013, the defendant [redacted] told two counselors at Austin High School to curtail enrollment in Teacher A's classes because Teacher A was "the star witness for the FBI against Dr. Tanner."

5. On or about February 25, 2013, the defendant [redacted] told EPISD Human Resources investigators that he had given Austin High School Counselors a directive to

remove students from the list for Teacher A's classes pursuant to a directive from Needs Assessment that positions at Austin High School had to be cut.

6. On or about March 13, 2013, the defendant, [REDACTED] emailed the Austin High School Comparative Report for inclusion in the Austin High School Needs Assessment package, which indicated that there was no student interest in a course taught by Teacher A.

7. On or about August 16, 2013, defendant, [REDACTED] falsely reported to EPISD police that a recent Austin High School graduate wanted to speak with the police to discuss pressing criminal charges against Teacher B.

8. On or about August 19, 2013, defendant [REDACTED] in his office at Austin High School, instructed a recent Austin High School graduate that he had researched the criminal statutes of limitations on a 2011 incident concerning Teacher B and that since the statute was two years, it had not run yet.

9. On or about August 19, 2013, defendant, [REDACTED] told the recent Austin High School graduate that "Dr. Tanner," had been removed because Teachers A and B were teaming up with counselors to make false accusations against Dr. Tanner.

10. On or about August 23, 2013, defendant, [REDACTED] met with the recent Austin High School graduate and told him not to tell an EPISD police officer that he had been "coached" or encouraged by defendant, [REDACTED] or by defendant, [REDACTED] to press criminal charges against Teacher B.

11. On or about August 23, 2013, at Cabo Joe's restaurant in El Paso, Texas, the defendants, [REDACTED] and [REDACTED] coached the recent Austin High School graduate to lie to EPISD police regarding his previous declination of charges against Teacher B.

All in violation of Title 18, United States Code, Section 371 and 1513(e).

## COUNT FIVE
### (18 USC § 1623)
### (False Declaration Before a Grand Jury)

The Grand Jury re-alleges and incorporates the Introduction and Overt Acts alleged in Count One, the Scheme and Artifice to Defraud alleged in Count Two, and the Overt Acts alleged in Count Four of this Indictment as if fully set out herein.

On or about September 26, 2013, in the Western District of Texas and elsewhere,

defendant,

[redacted]

who was, at the time, under an oath to tell the truth in a federal grand jury proceeding in El Paso, Texas, knowingly made a false material declaration to said grand jury; that is, the defendant [redacted] with the intent to mislead the grand jury in regard to a federal investigation of conduct occurring at EPISD, including fraud against the government, wire fraud, mail fraud and retaliation against witnesses, testified falsely regarding an incident involving a recent Austin High School graduate, in that the defendant testified that the recent Austin High School graduate called the defendant and visited her at Austin High School on August 16, 2013, to seek her help to "look into pressing charges" against Teacher B, and the defendant further testified that the recent Austin High School graduate asked her to get information regarding pressing criminal charges against Teacher B, when the defendant [redacted] knew her testimony was false and misleading in that the recent Austin High School graduate had not initiated contact with her and had not called or visited her, rather, the defendant, [redacted] had engaged a relative of hers to contact the recent Austin High School graduate and convince him to press criminal charges against Teacher B in order to prevent Teacher B from future employment at Austin High School, to injure the reputation of the Teacher B, and to discredit Teacher B as a cooperator and witness in a pending federal investigation involving defendant, [redacted] in violation of Title 18, United States Code, Section 1623.

## COUNT SIX

**[18 U.S.C. § 1001(a)(2)]**

**(Material False Statements to a U.S. Government Agency)**

The Grand Jury re-alleges and incorporates the Introduction and Overt Acts alleged in Count One, the Scheme and Artifice to Defraud alleged in Count Two, and the Overt

Acts alleged in Count Four of this Indictment as if fully set out herein.

On or about August 20, 2012, in the Western District of Texas and elsewhere, defendant,

[redacted]

in a matter within the jurisdiction of the Federal Bureau of Investigation (FBI), an agency of the of Executive branch of the United States government, that is, during an interview with agents of the FBI, who were engaged in their official capacity investigating a possible federal criminal matter, the defendant, [redacted] knowingly and willfully made materially false, fictitious and fraudulent statements and representations in his answers to the agents' questions, to wit: the defendant, [redacted] told the agents that he had been angered by the actions of a former EPISD administrator, which caused him to make a complaint to the EPISD Police against a high school administrator for engaging in criminal misconduct; and further told the agents that the EPISD Police officer refused to accept the complaint, when the defendant [redacted] knew that his materially false statements were meant to mislead the FBI investigators into believing the defendant had attempted to bring the existence of unlawful conduct to the attention of law enforcement and were meant to impede the government from learning that he and others engaged in unlawful conduct, in violation of Title 18, United States Code, Section 1001(a)(2).

RICHARD L. DURBIN, JR.
UNITED STATES ATTORNEY

By: ______________________.
Assistant United States Attorney

ORIGINAL SIGNATURE
REDACTED PURSUANT TO
E-GOVERNMENT ACT OF 2002

GRAND JURY FOREPERSON